Liberty Surety Bond Insurance Company (hereinafter called the "Liberty"), a New Jersey insurance company, *Page 192 
deposited with the commissioner of banking and insurance real estate bonds and mortgages aggregating $110,000 face value, pursuant to section 10 of the Insurance Company act, "for the benefit and security of all the policy holders of the company depositing the same."
After having carried on an insurance business for some years, it undertook a voluntary dissolution. Complainant (hereinafter called the "Aetna") having incurred loss covered by a contract of insurance between it and the Liberty, filed its bill in this court, seeking to establish a trust in the said bonds and mortgages for the benefit of complainant and other holders of insurance written by Liberty, and seeking the due administration and liquidation of that trust.
Complainant brought in as parties defendant the Liberty, the International Re-insurance Corporation (hereinafter called "International"), General Indemnity Corporation of America (hereinafter called "General Indemnity"), the commissioner of banking and insurance (hereinafter called the "commissioner"), and a little later, John E. Toolan, receiver of the Independence Indemnity Company (hereinafter called "Independence") — these defendants being parties who had made, or might make, claim to ownership of, or interest in, the said bonds and mortgages.
Subsequently James R. Barber was appointed by this court receiver in dissolution of the Liberty, and was later given leave to become a co-complainant, instead of a defendant, in this proceeding.
By decree entered herein on January 11th, 1934, it was adjudged that the bonds and mortgages in question were impressed with the trust pursuant to paragraphs 8 and 10 of the Insurance act aforesaid for the benefit of policy holders of the Liberty; and the said bonds and mortgages were assigned by the commissioner to the receiver of Liberty, pursuant to the provisions of that act and an order of this court.
This court has jurisdiction over the trust res (the bonds and mortgages) and over the administration of the trust. AetnaCasualty and Surety Co. v. International Re-Insurance Co.,114 N.J. Eq. 516; 169 Atl. Rep. 113. The receiver *Page 193 
of Liberty is now the trustee. The administration of the trust involves the liquidation of the trust res; the ascertainment of such persons, if any, as have preferential rights or interests in this trust fund, as policy holders of Liberty, pursuant to the statute; the ascertainment of the amounts of the respective claims of such policy holders and the making of payment to them, out of the proceeds of the trust res, of the several amounts so due to them, or a pro rata dividend thereon (if the proceeds of the trust res be insufficient to pay such claims in full); the ascertainment of the party or parties having rights in, or to, the said trust res, subordinate to the rights of the preferred policy holders aforesaid; and the payment or distribution to such subordinate claimants, if the proceeds of the trust res prove more than sufficient to pay the claims of the preferred policy holders.
Notice of the receivership of the Liberty and the liquidation of the assets has been given in the usual way to the creditors and stockholders of Liberty, and the usual order to limit creditors and order to bar creditors have been duly entered.
Divers claims have been filed with the receiver of the Liberty, and a report of the filing of such claims has been filed by the receiver in the cause. This report of the receiver further sets forth that he has allowed the claim of Aetna in the total sum of $34,806.26 as a claim entitled to preferential payment from the proceeds of the bonds and mortgages aforesaid, and that no other of such claims have yet been similarly allowed by him.
Appeal has been taken from his allowance of the Aetna's claim and is pending before this court. The same issue has also been raised by the answers of certain of the defendants to the bill, who deny the right of Aetna to preferential payment out of the trust res.
Since the commencement of the proceedings an ancillary receiver has been appointed in this state for General Indemnity, and has been made a party to this proceeding. International has also become insolvent, and ancillary receivers in this state have been appointed by the United States district court, and have filed answer herein. *Page 194 
The answer of the receivers of International claims that the Liberty was dissolved; that Commonwealth Casualty Company became entitled, by assignment from the Liberty, to all of the assets of Liberty, including the trust res in question; that the trustres (the bonds and mortgages in question) was released by the commissioner, although never actually assigned or delivered to Commonwealth Casualty, or anyone else; that Commonwealth Casualty thereafter became merged with Independence and that thereby Independence became entitled to all of the assets aforesaid, including the trust res; that thereafter Independence transferred all of its assets to International, whereby International became entitled to the assets aforesaid, including the trust res. The receivers of International claim the ownership and right of possession of the bonds and mortgages free of any claim in favor of any policy holders of the Liberty.
They contend that Aetna is not a policy holder within the meaning and intent of the Insurance act, and is not entitled to any preferential rights in the trust res; that there are no other policy holders entitled to any such preferential rights; and they also claim that Aetna released the Liberty from any and all claims which it had against Liberty.
The receiver of Independence filed answer and also a counter-claim against the Aetna, International, Liberty and General Indemnity. This answer and counter-claim sets up that the agreement whereby Independence assigned all of its assets to International was invalid and fraudulent in that International at the time was insolvent and the agreement was a fraud upon Independence; and the Independence receiver claims the right of ownership and possession of the trust res, free of any claims of policy holders of Liberty and free from any claim by International or its receivers.
The General Indemnity filed an answer and also filed a counter-claim against the International, the Liberty, the Aetna and the commissioner. This counter-claim sets up that the bond for $250,000 executed by the International as principal, and the General Indemnity as surety, to the commissioner conditioned for the payment of liabilities of Liberty, *Page 195 
was and is invalid and of no effect, because it was never completely delivered to, or accepted by, the commissioner, and because it was ultra vires the General Indemnity (a New York corporation) under the laws of New York. The counter-claim asks that this $250,000 bond be surrendered up and canceled, and that the Aetna be restrained from further prosecuting a suit at law heretofore commenced by the Aetna against the General Indemnity, based on the provision of such bond.
The commissioner answers this counter-claim and denies that the delivery of the $250,000 bond to him, and its acceptance by him, was incomplete, and denies that the said bond is not in full force and effect. Similar answers were filed by the Aetna and the Liberty and the Liberty's receiver.
Answer was filed by the Aetna, and by the receiver of Liberty to the counter-claim of the receiver of Independence — denying the validity of his claim to the trust res in question.
The situation as to the pleadings and the actual issues in this litigation is somewhat complicated, and justifies or requires some clarification.
The original bill was filed by the Aetna (claiming itself to be a cestui que trust), alleging that a trust had been created, and still existed, in respect of the mortgages in question, for the benefit of it the Aetna) and others — and seeking the due enforcement and administration of that trust. The suit thereby commenced was against all parties claiming interest in the said mortgages. None of the parties seriously contested the fact that the Liberty had conveyed these mortgages to the commissioner to hold in trust as security for the benefit of policy holders of the Liberty who might thereafter become entitled to the payment from the Liberty of claims arising out of their policies. In any event, the proofs show beyond question that such was the fact and that the commissioner, at the commencement of this suit, still held legal title to, and possession of, the mortgages. It should be added, of course, that by operation of law, the title conveyed to the commissioner in trust as aforesaid was upon the further trust that if and when the claims of any and all policy holders had *Page 196 
been fully satisfied and there was no further possibility of further claims in favor of any such policy holders, he should convey the mortgages back to the Liberty (the original grantor) or to such persons as should have succeeded at that time to the interest of the Liberty.
Some of the defendants contended that the Aetna was not a policy holder of the Liberty, and some contended that if the Aetna was a policy holder of the Liberty, it had surrendered or waived any and all right or claim on its part against the mortgages in question — and indeed against Liberty or any of its assets. Neither of these contentions denied the creation or existence of the trust; they denied only that the complainant Aetna had any interest in the trust. Whatever importance the issues thus raised had, or might have had, in the determination of the original suit, vanished after the statutory receiver had been appointed for the Liberty and had become a party to the suit and had joined as a co-complainant in the bill. As such receiver he represented all the creditors and stockholders of the Liberty, and therefore, of course, represented all of the policy holders of Liberty who had or could have claims against the trust fund in question, and therefore whether or not the suit was maintainable by the Aetna, it was maintainable at the instance and in the right of the receiver of Liberty.
The answers by the International's receivers (and perhaps also the answers on behalf of the receivers of Independence) contend that prior to the commencement of the suit, the commissioner (as trustee) released to the Liberty, or its successors in interest, all of its right and interest in and to these mortgages, in exchange for other securities given to him in place thereof, and that thereby the mortgages in question became and were freed of the trust, prior to the commencement of the suit, and that no trust thereafter existed in regard to these mortgages. This contention is a real defense to the original bill, on its merits. It clearly appears, however, from the proofs and arguments at the final hearing, that this defense is not sustainable. In the first place, the commissioner did not release the mortgages or the rights and *Page 197 
interest therein which he held in trust as aforesaid. There is no proof that he either made any such release, or that he agreed to give any such release — although it does appear that a $250,000 bond made by the International as principal and the General Indemnity as surety was given to him, conditioned for the payment of the liabilities of Liberty. Moreover, it may at least be doubted that the commissioner as such trustee had any right or authority under the law to make any such release, or to agree to make any such release — at least in the absence of any order of authorization by a court of competent jurisdiction, after notice to interested parties; and there is no proof of any such authorization.
It results therefore that inasmuch as the creation and existence of the trust in these mortgages has been established, and the alleged termination of the trust in them has been disproved, the original suit must be concluded by decree that the commissioner held the mortgages upon the trusts aforesaid, and that the receiver of Liberty, to whom the commissioner assigned the mortgages after the commencement of this suit, holds them subject to the same trusts with the power and the duty to proceed to administer and perform those trusts.
That concludes and disposes of the issues in the main or original suit. There remain the issues raised by the counter-claims filed by some of the defendants, and by the last amended bill filed by complainant Aetna and joined in by the receiver of Liberty as a co-complainant. The International's receivers, by their counter-claim, allege that there are no persons who now have, or in whose favor there can hereafter arise, any valid claims against Liberty in respect of policies issued by Liberty, and that therefore there are no longer any actual or contingent beneficiaries of the trust, other than those persons entitled in equitable remainder after the satisfaction of the claims of any and all policy holders of Liberty; and they claim that they are entitled therefore to the mortgages, as successors to the interest of the Liberty, by virtue of certain alleged mesne conveyances or transfers. A similar contention is made by the receiver *Page 198 
of Independence, claiming the right to the mortgages in question. The Aetna and the receiver of Liberty claim that the transfer by Liberty to Independence, of the equity in the two bonds and mortgages (over and above the rights of "policy holders" under the statute), and of some $700,000 of other assets of Liberty, was in fraud of the creditors and stockholders of Liberty, and that the receiver of Liberty is therefore entitled to these assets, to be liquidated and distributed in the winding up of Liberty's affairs as a dissolved corporation, and that the general creditors and stockholders of Liberty are entitled to participate in the distribution of the said assets (including the value of the two bonds and mortgages over and above the amount, if any, due to "policy holders" under the statute).
These claims, however, do not raise any issues in the original suit to determine whether or not a trust exists in respect of the mortgages in question. They are claims to be determined in the course of the administration of the trust which has been adjudged and established.
The situation in this case — apparently complicated on the face of the various pleadings — is in reality fairly simple.
The original bill was filed to establish a trust in the particular res, for the benefit of policy holders of Liberty, and to have the court take jurisdiction over its administration. Decree to that effect has been made, and the trust res was turned over by order of this court to the receiver of Liberty, as trustee of the said res. The receiver of Liberty is also a trustee in fact of all the assets, rights and credits of Liberty and charged with the duty of liquidating the same and making distribution to all those entitled to share therein (all creditors and/or stockholders of Liberty — all persons having valid claims against the assets of Liberty), in the winding up of the affairs of that dissolved corporation.
The claims of "policy holders" of Liberty, under the statute — (or of persons claiming to be such) — are simply claims of preference in a particular asset in the hands of the Liberty receiver — the original trust res turned over by the commissioner. The matter is now essentially nothing more *Page 199 
or less than an administration of the dissolved Liberty's assets and affairs by its receiver — and may be treated accordingly. The pending issues are simply those of conflicting claimants to assets in the hands of Liberty's receiver.
To state it generally — the problem before the court is to ascertain what are the assets of Liberty, and to whom and in what order of preference are they to be distributed?
The particular issues may be stated as follows:
1. Is Aetna a preferred creditor as to the particular res
(the two bonds and mortgages); and if so, in what amount?
2. Are there any other claimants who are entitled to preferential rights in the particular res; and if so, who are they, and what are the amounts to which they are entitled?
3. Are International receivers entitled to any preferential right in the particular res, and if so what?
4. Is Aetna a general creditor of Liberty; and if so, in what amount?
5. Are there any other general creditors of Liberty; and if so, who are they and in what amounts?
As to 1 and 2. The particular res consists of the securities deposited by Liberty with the commissioner under the provisions of section 8 of the Insurance act of 1902 (P.L. 1902 p. 407), and subsequently turned over (in accordance with section 11) to the receiver of Liberty, who, of course, holds them on the same trusts with which they were charged in the hands of the commissioner, to wit., "for the benefit and security of all the policy holders of the company depositing the same," as provided by section 10 of the act.
Aetna claims that it is such a "policy holder" of Liberty. The statute contains no definition of the term "policy holder." It is a general statute dealing with all kinds of insurance — fire, life, accident, liability, fidelity, indemnity, c. — see section 1 thereof. Contracts of fire, life, accident and liability insurance are commonly called insurance "policies." Contracts of guaranty or surety insurance — insurance of the performance of contractual obligations or other duties — are most frequently written in the form of a bond and are commonly called "bonds" and not "policies" — "surety bonds," "contract bonds," "indemnity bonds," and the like. *Page 200 
It is this latter class of insurance in which Liberty was authorized to engage and was in fact engaged. The ordinary and usual contracts which it wrote were of the class of indemnity against loss by reason of breach of duty or obligation, and were in the form of bonds. Inasmuch, however, as the statute deals with this class of insurance as well as with the classes in which the contracts are commonly called "policies;" inasmuch as section 10 is obviously a general provision, intended to apply to all classes of insurance; inasmuch as the statute does not use the word "bond" as a name for insurance contract, but does in section 2 obviously use the word "policy" as a name for all insurance contracts — from all this, and a consideration of the history of the legislation, as later herein mentioned, it cannot be doubted that the word "policy holders" in section 10 was intended to include persons holding those contracts of insurance (made with persons other than other insurance companies) which are contracts of indemnity against loss by reason of breach of duty or obligation, whether such contracts be in the technical form of "bonds" or in some other form.
Moreover, section 46 of this act of 1902, provides that surety bonds made by insurance companies incorporated thereunder and authorized to carry on the business of insurance (indemnifying) against loss by reason of breach of duty or obligation (specified in subdivision 7 of section 1 of the act), shall be deemed and taken to be in full compliance with all qualifications prescribed by statutes under which the giving of such a surety bond is required or authorized. This is an obvious recognition of the fact that such surety bonds (whether or not they be in cases where such bonds are required or authorized by statute) are contracts of insurance against loss by reason of breach of duty or obligation, and of the kind contemplated by insurance companies organized under the act for the purpose of doing the business specified in subdivision 7 of section 1, and are "policies" within the meaning of that word in section 2. Section 47 requires that any such insurance company, in order to be entitled to the benefits of the provision of section 46, "must comply with all *Page 201 
the requirements of the act applicable to such company" — and assuredly sections 8 and 10 deal with one of such requirements. All this further confirms the conclusion that the holder of such a surety bond is a policy holder within the meaning of section 10.
See, also, 1 Cooley Ins. Briefs (2d ed.) 772, and 2Cooley Ins. Briefs 988. An insurance policy is the formal written instrument in which the contract of insurance is embodied; and a contract of insurance by a surety or guaranty company, though in the form of a bond, is in fact a policy of insurance and should be so construed.
Those persons (if any), holding surety bonds, contract bonds or other insurance bonds written by the Liberty, on which any liability on the part of Liberty still exists unsatisfied, come within the category of those for whose benefit and security the particular res was deposited by Liberty; and are entitled to be paid, in full or pro rata as the case may be, out of the proceeds of that res — unless they have been cut off by the order barring creditors who failed to file claims with the Liberty receiver within the time limited therefor.
Whether or not there are any such — (disregarding Aetna for the moment) — and if there be, what are the amounts of their valid claims, does not as yet appear, and cannot be determined until the receiver has made further determination and report, and such report has been passed upon by this court. It does appear, by report of the Liberty receiver heretofore filed herein, and by his testimony at the hearing, that some claims of this nature were filed with him within the time limited, but that he had not then as yet made determination as to the allowance or disallowance of any of them (except that of Aetna).
The position of Aetna, however, is not that of the ordinary holder of a bond issued by Liberty. Its claim arises out of one or more contracts of re-insurance — (so entitled and so in fact) — entered into between it and Liberty, whereby Liberty "re-insures" Aetna, for a certain part of Aetna's liability on bonds issued by Aetna, against loss by reason of such bonds. It is contended against Aetna's claim, that its position as *Page 202 
one re-insured by Liberty is not that of a "policy holder" — that it is not one of the class which the legislature intended to protect by section 8 and section 10 of the statute.
It is obvious, of course, that there is both a technical and an actual difference between the ordinary or usual contract of insurance and a contract of re-insurance whereby another insurance company is indemnified against all or part of liability on an ordinary or usual contract or insurance written by it.First, one is a contract of direct, original insurance, insuring the original applicant; the other is a contract of re-insurance, insuring the insurer of the original applicant and indirectly insuring the latter. Second, the contract of insurance may or may not be a contract of indemnity — the contracts of fire and life insurance are frequently not contracts of indemnity; whereas the contract of re-insurance is a contract of indemnity. Third, in practical purpose and effect, the re-insurance contract (at least from the standpoint of the company re-insured), is a method whereby the original insuring company takes another company into "partnership" on the particular risk, thus avoiding "putting too many eggs in one basket" — the motive for which might be merely business prudence, or the compliance with statutory limitations.
(The proofs show that Aetna and Liberty had a mutual agreement under which, from time to time, each might, and did, offer to the other and the other accept a share of a particular risk; and if accepted, the sharing of the risk was in accordance with the standard form or re-insurance contract).
On the other hand, from the standpoint of the re-insuring company, the contract of re-insurance is simply the issuance of another contract of insurance — and, in the case of an indemnity insurance company such as Liberty, a contract of exactly the same kind as its ordinary and usual contracts; to it, the only difference is that under the re-insurance contract the insured is another insurance company instead of one of the general public.
The question of course is purely one of interpretation of our statute. Did the legislature intend that an insurance company, of a foreign state, re-insured by the New Jersey *Page 203 
company, should be included as one of those for whom the security of this fund was provided?
Re-insurance is a distinct form or class of insurance. 1Cooley Ins. Briefs (2d ed.) 10, 774. It is a contract insuring an original insurer against loss by reason of another contract of insurance between the original insurer and its insured. It is always a contract of guaranty or surety insurance, but the original contract which it re-insures, may be a contract of fire or life or any other kind of insurance, including of course guaranty or surety insurance. Guaranty or surety insurance is also a distinct form or class of insurance, and one which has come into being or into importance only in recent years. Ibid.15.
If the statute dealt only with fire and life insurance (and assuming in such case that Liberty was a fire or life insurance company and was authorized to re-insure other companies on risks written by them) the differentiation would be more clear. For contracts of fire and life insurance are, and for many years have been, commonly known as "policies;" and they are not contracts of guaranty or surety insurance, whereas a contract of re-insurance is a contract of guaranty or surety insurance. It would be reasonable to conclude therefore that by "policy holders" — holders of "policies" — the legislature meant the holders of those contracts of fire or life insurance which the company was in the business of writing, and not the holders of contracts of guaranty or surety insurance which were merely incidental to the main business.
This conclusion would be based upon, or fortified by, the reasonable presumption that the purpose of the legislature was to protect the general public — the ordinary citizens who bought "policies" and who would have little or no opportunity to have or obtain knowledge as to the solvency or financial responsibility of insurance companies — by companies which might be irresponsibly or poorly managed: to require that there should always be a fund, for the protection of the citizens who bought policies, which could not be dissipated, encumbered or diminished by reason of any improper or unskillful management of the company's business or assets. *Page 204 
The determination in Shepherd v. Virginia State InsuranceCo., 120 Va. 383 — apparently the only reported case dealing with this question — is substantially to the foregoing effect, and involved substantially the postulated circumstances. Reference to the Virginia statute shows that it is made up of several chapters constituting practically separate statutes, one of which deals only with fire and life insurance companies and another of which deals with guaranty, trust, fidelity, indemnity and security companies. In each of these two chapters is a requirement for deposit of a security fund. In the fire and life insurance chapter this fund is stated to be for the benefit of "policy holders;" in the other chapter it is stated to be for the benefit of "any citizen of this state who may be interested in the faithful performance of any of the undertakings or obligations of such company."
Investigation of the genesis and history of our insurance legislation shows that the first statute for the incorporation of insurance companies was enacted in 1852 (P.L. 1852 p. 159); and that the provisions of section 8 and section 10 of the statute of 1902 had their origin in section 8 and section 9 of the statute of 1852. That statute dealt only with marine, fire, life, health and accident insurance. The contracts in all of those types of insurance are contracts of insurance other than and not being guaranty insurance, and were commonly known as "policies." Obviously contracts of guaranty insurance were then rare and little known — entered into only in individual and exceptional cases. There was no "business" of the writing of such contracts, and there were no persons interested in making a business thereof. The statute does not deal with them; hence, when in section 8 and section 9 it required the deposit with the state treasurer of a fund for the benefit and protection of "policy holders," it is reasonable to conclude, in accordance with the views hereinbefore expressed, that it did not intend to include in the category of holders of "policies" of insurance, companies who held contracts of guaranty insurance — not then commonly known as "policies" — indemnifying them against risk of loss in respect of policies of insurance written by them. *Page 205 
That statute continued in force and effect the entire fifty years down to 1902 — (although with a few amendments and with numerous additions by way of supplements) — see the compilation.Gen. Stat. N.J., 1895, tit. "Insurance." The provisions of section 8 and section 9 continued without essential change down to the passage of the act of 1902 — (in the interim the state comptroller was substituted for the treasurer as the custodian of the fund, and later the commissioner of banking and insurance was substituted in the place of the comptroller) — and are found as section 23 and section 24 in the Gen. Stat. 1895, in a statute which (except for the effect of the supplement of 1885, infra), still deals, according to its express terms, only with marine, fire, life, accident and health insurance. Hence it must be deemed that the meaning of the word "policy holders" still continued to exclude other insurance companies holding contracts of guaranty insurance "re-insuring" their own policies — unless that meaning was altered as the result of the passage in 1885 of a supplement to the act of 1852. That supplement (P.L. 1885 p.
254), authorized the incorporation of "surety bond" insurance companies, and provided (section 3 thereof) that such companies should be subject to the provisions and regulations of the act of 1852. It seems obvious that by this legislation it must have been intended that surety bond insurance companies must make the deposit with the insurance commissioner required of the other insurance companies, and that such deposit was to be for the benefit and security of that class of persons having the same relation to the surety bond insurance company as "policy holders" bore to the other insurance companies — namely those persons holding direct bonds or obligations other than and not being re-insurance obligations. It seems equally obvious that it was not intended by this supplement to add to, or include in, the category of "policy holders" companies holding re-insurance obligations or contracts made by the surety bond insurance company — for there is nothing whatever, either expressed in the terms of the supplement nor to be derived by implication either from its terms or from the attendant circumstances, to indicate *Page 206 
any intent for such addition or inclusion. This supplement likewise continued in force and effect until 1902 — and is found in Gen. Stat. 1895 §§ 87, 91, tit. "Insurance."
In 1902 the legislature undertook to, and did, revise the law as to insurance companies — gathering up and simplifying the act of 1852 and its numerous supplements, with some modifications and additions, into a single statute (P.L. 1902 p. 407), which was the statute still in force and effect at the time of the making of the deposit now in question, and hence controls the determination of the present issue.
In this new statute of 1902, surety bond insurance companies (and others) were added to and included in the list or specification of those insurance companies with which the act expressed itself as dealing. This took the place of the supplement of 1885. The provisions of section 8 and section 9 of the act of 1852 were carried over without essential change (so far as concerns our present issue) into the new act, in section 8 and section 10. It results therefore (since there is nothing to indicate the contrary) that the meaning which was attached to the word "policy holders" in section 9 of the act of 1852, after the supplement of 1885, is the same meaning which is to be accorded to it in section 10 of the act of 1902.
It may further be observed that, as evidenced by sections 17 and 76 of the act, the legislature in this statute contemplated re-insurance as a different and distinct thing from the ordinary or usual insurance.
Aetna's counsel urges State v. Tomlinson, 101 Ohio St. 459,
as an authority in its favor, but the determination in that case is in nowise helpful. The case deals with an issue quite different and with a statute different both in language and purpose. Briefly, it determines that the writing of re-insurance contracts is the doing of insurance business.
Aetna also puts forward a theory of subrogation — as to which it is sufficient to say that there can be no subrogation of a right which does not exist. Aetna's claim is not based on re-insurance by it of Liberty's liability to Liberty "policy holders," but on re-insurance by Liberty of Aetna's liability to Aetna's policy holders. Assuming that Aetna's insured *Page 207 
might have maintained a suit directly against Liberty, such insured certainly was not a policy holder of Liberty and hence had no right of preference in the fund to which Aetna could be subrogated.
It is concluded that Aetna's claim is not entitled to preferential participation in the statutory fund or deposit; and the receiver's contrary determination must be reversed.
As to question 3. The proofs show that on, or as of, December 31st, 1931, Liberty or its directors as trustees in dissolution, executed a transfer of all its assets to Independence — which necessarily included the equity of Liberty, over and above the rights of any "policy holders" of Liberty, in the securities deposited by Liberty with the commissioner — and that subsequently Independence transferred all its assets to International. It results therefore that if these transfers were valid, the claim made herein by the federal court's receivers of International must be sustained and they be decreed to be entitled to Liberty's former equity or pledgor's interest, in the deposit — or indeed to the whole deposit, if there should prove to be no "policy holders" of Liberty entitled to payment therefrom.
(It seems scarcely necessary to state that whatever rights in the statutory deposit made by Liberty were acquired by Independence and International by these transfers, were, of course, subordinate and subject to the rights of the statutory beneficiaries of the trust — the policy holders of Liberty.)
It is contended, however, by Aetna and by the receiver of Liberty in his capacity as representative of the creditors of Liberty, that this transfer to Independence was in fraud of the creditors of Liberty, and therefore invalid as to them, because that transfer was without consideration and rendered Liberty insolvent; and that the rights or interests acquired by International (by the subsequent transfer to it from Independence) in the assets of Liberty were no greater than the rights or interest acquired by Independence, because International took from Independence with full knowledge of the situation and circumstances of the transfer from Liberty to Independence. *Page 208 
The bill of sale from Liberty to Independence, dated December 31st, 1931, conveys all of Liberty's property whatever; it recites consideration of "one dollar and other good and valuable consideration." The proofs show that the actual consideration was the receipt by the stockholders of Liberty of shares of stock of Independence (at the same time surrendering their shares of stock in Liberty by dissolution of Liberty). There was no consideration other than this, except the payment by Independence of some expenses incidental to the transfer and some small current business debts of Liberty (for office expenses) — all told amounting to only a few hundred dollars. (It further appears that at least a portion of these payments were made by Independence as agent for International — and not therefore in consideration of the assets of Liberty.)
Prior to the transfer from Liberty to Aetna, Liberty had insured all of its outstanding risks, or insurance liabilities, with International, by a contract executed September 16th-17th, 1931 — for which re-insurance by International Liberty agreed to pay International a proper premium, without stating the exact sum. It appears by the International's receipt, dated October 5th, 1931, that Liberty actually paid to International, as and for such premium, over $306,000.
It appears, by the reports filed by Independence with the commissioner of banking and insurance, that the value of the assets transferred from Liberty to Independence was at least the sum of $702,987 — over and above the premium to International for the re-insurance, and over and above any and all liabilities of Liberty for which Independence was in anywise liable. It appears by an agreement between Independence and Commonwealth Casualty Company that the net value of Liberty's assets received by Independence was over $798,000. But taking the lesser sum — it is evident that Independence received from Liberty some $700,000 in assets for which there was no consideration to Liberty other than the shares of stock of Independence issued not to Liberty but to the Liberty stockholders individually; and Liberty was dissolved as a corporation, simultaneously. *Page 209 
Essentially therefore, that which was done by the Liberty's directors and stockholders, was the re-insurance of Liberty's insurance risks, the sale of Liberty's assets, the payment (it may be assumed) of Liberty's debts other than its liabilities on its policies, and the dissolution of Liberty's corporate existence, and the distribution amongst the stockholders of Liberty of the balance of the proceeds of sale of Liberty's assets amounting to some $700,000 without the contingent liability of Liberty on its outstanding policies having been paid, satisfied, released or discharged.
In other words Liberty's stockholders, by this transfer, divided up amongst themselves all of Liberty's assets — (under the all-inclusive language of the bill of sale even the International's re-insurance contract with Liberty went to Independence) — leaving Liberty's contingent creditors unpaid.
It is only fair to say that Liberty's stockholders had attempted to provide for the due payment of these contingent creditors, by procuring their re-insurance by International, and that there is nothing to show that they had any reason to doubt that such re-insurance was, from a practical standpoint, an adequate provision in that behalf or that they had any reason to doubt International's solvency or financial responsibility. Furthermore many of those of the outstanding contingent claims which later ripened into actual liabilities, were thereafter paid by International before it became insolvent. Some $300,000 was paid by International in satisfaction of such claims.
The fact remains, however, that at the time Liberty's stockholders divided its assets amongst themsevles, there was an actual outstanding contingent liability on the part of Liberty for many hundreds of thousands of dollars; that much of that contingent liability later ripened into actual liability, and that of such actual liability a very considerable amount still remains unpaid. The receiver's report shows that over $60,000 in claims for liquidated sums were filed with him within the time limited, besides numerous other claims for amounts as yet unliquidated; and International (which, as between it and Liberty or Liberty's stockholders, ought to *Page 210 
pay these claims under its contract of re-insurance), is insolvent and being wound up by receivers.
It would seem to need no argument to establish the fact that the claims of these creditors of Liberty constituted a claim upon the assets of Liberty ahead of any and all rights of Liberty's stockholders in those assets. They were creditors — albeit contingent creditors — of Liberty at the time of the dissolution and distribution. The liability of Liberty to them was not discharged by Liberty's dissolution nor the approval of that dissolution by the commissioner. Nothing in the statute gives any such effect to the dissolution or to the commissioner's approval thereof; and the effect of some of the statutory provisions is quite the contrary.
By section 57 of this Insurance act, the provisions of the General Corporation act (if not inconsistent with the provisions of the Insurance act), are made to apply to insurance companies and their directors and stockholders. By section 54 of the Corporation act, upon the dissolution of a company, the directors are constituted trustees, with full power — and of course equal duty — to settle its affairs and divide its assets among the stockholders "after paying its debts." The company is continued a body corporate — section 53 — for the purpose of winding up its affairs. On the dissolution of a corporation, its property constitutes a trust fund for the payment of debts and stockholders. American Dock and Improvement Co. v. Trustees,c., 39 N.J. Eq. 409 (at p. 419). The investment of the corporate assets in the stock of another corporation was obviously a breach of trust as to the outstanding policy holders — creditors — of Liberty. The rights of creditors of the corporation, as beneficiaries of the trust assets being superior to the rights of stockholders, it was also a breach of trust to divide the assets of the Liberty among the stockholders, leaving creditors of Liberty unpaid. Dalsheimer v. Graphic Arts Co.,86 N.J. Eq. 49; affirmed, 89 N.J. Eq. 210.
On the transfer of the Liberty assets to Independence, therefore, Independence took those assets subject to the equities of creditors of Liberty — and this for two reasons. First, *Page 211 
because Independence (the transferee) did not pay to Liberty (the transferor) a single dollar for the $700,000 assets transferred;second, because Independence took with actual knowledge of the fact that the transfer was in breach of trust of the rights of Liberty creditors in those assets. It is unnecessary to go into the evidence as to this latter part: it is proven beyond question, and indeed is not controverted by any of the parties.
The same result is also reached by consideration of other statutory provisions. By section 64 of the Corporation act, a transfer of any of the corporate assets in contemplation of insolvency is prohibited, and any such transfer is null and void as against creditors — except that a bona fide purchase for a valuable consideration, by one without notice is not invalidated. Such a transfer is null and void not only when made in payment of a bona fide corporate debt, but also even when made for a bonafide presently moving actual valuable consideration, if the transferee has knowledge or notice that it is made in contemplation of insolvency. Cope v. C.B. Walton Co., 79 N.J. Eq. 165; 80 Atl. Rep. 473.
In the instant case the result of the transfer to Independence was to render Liberty insolvent — without assets sufficient to pay its debts (its outstanding contingent liabilities) — without any assets at all but with hundreds of thousands of dollars of outstanding contingent liabilities. A transfer which had, and which was known and intended (not only by Liberty's officers and directors but also by many, if not all, of its stockholders) to have that result, was assuredly in contemplation of insolvency, and the transfer must be deemed void under the statute. It is not saved under the proviso, for the transferee (Independence), not only paid no valuable consideration to Liberty therefor, but it also was not without notice: as has already been said, it had knowledge of the entire facts and circumstances.
Still further — the transfer is voidable, under the common law, and under the Uniform Fraudulent Conveyance act, as in fraud of creditors — being a transfer without receipt of consideration and which left the transferor with large outstanding *Page 212 
liabilities and with no assets to pay them. The assets transferred are impressed in the hands of the transferee, who paid no consideration to the transferor and who knew the situation as to the result on the transferor's solvency, with a trust in favor of the outstanding creditors. Haston v.Castner, 31 N.J. Eq. 697 (at p. 702); Horton v. Banford,79 N.J. Eq. 356 (at pp. 377 et seq.); Couse v. ColumbiaPowder Manufacturing Co., 33 Atl. Rep. 297.
As to the same result of the facts and circumstances of this transfer, under the provisions of the Uniform Fraudulent Conveyance act (P.L. 1919 p. 500), see Kearny Plumbing SupplyCo. v. Gland, 105 N.J. Eq. 723, and cases cited; alsoChorpening v. Yellow Cab Company of Camden, 113 N.J. Eq. 389;167 Atl. Rep. 12. The latter case is very similar in its facts to the situation here under consideration — even including the fact that the unpaid debt was only a contingent liability at the time of the transfer.
Under the terms of that act "creditors" include persons having unliquidated and contingent claims; and "debts" include unliquidated and contingent liabilities. In view of the fact that the instant transfer left no assets to the transferor — not even the re-insurance contract by International — it is obviously fraudulent under section 5; and also under section 4 — because the "probable liability" (section 2, paragraph 1), of Liberty on its outstanding contingent obligations would be of course some material amounts, and it had absolutely no assets left. The transferee paid no "fair consideration" to the transferor in exchange — (section 3).
The assets transferred by Liberty to Independence were thereafter transferred by Independence to International — including the equity or pledgor's interest of Liberty in the particular res or statutory deposit. International, however, acquired thereby no greater or better rights than Independence, because whatever consideration was paid by International, it is amply proven herein that International had notice and knowledge, through its president and a number of its directors, of all the facts and circumstances of the transfer from Liberty to Independence. All the assets which came *Page 213 
to International by this transfer from Independence, therefore, remained subject, in the hands of International, to the same equities to which they were subject in the hands of Independence. Hence the claim or interest of International's receivers in the particular res or statutory deposit, is subordinate to the rights of the general creditors of Liberty therein, as well as to the prior preferential rights of "policy holders" of Liberty.
It follows of course that Liberty's general creditors have an equity in the other assets transferred by Liberty to Independence and by the latter to International, and impressed as before stated with a trust in favor of Liberty's creditors. Since those other assets are in the jurisdiction and control of the federal court in the International insolvency proceedings, the pursuit of those assets and enforcement of that equity should be made in that court and in that proceeding; and to that end order was made by this court authorizing Liberty's receiver to take that action.
Who are the general creditors of Liberty, and what are the amounts to which they are entitled, cannot be determined until the filing of the further report of the Liberty's receiver in that behalf, and the determination of such appeals (if any) as may be made therefore.
One question remains — as to whether or not Aetna is a general creditor of Liberty. It is contended by some of the parties herein that Aetna has no valid claim, because (it is contended) Aetna released, surrendered or waived any and all claim against Liberty at, or shortly after, the time of the transfer from Liberty to Independence and the re-insurance by International of all the Liberty's risks. This contention cannot be upheld.
By a tri-party contract formally dated August 31st, 1931, but expressed as having been actually signed October 13th, 1931, reciting the liability of Liberty to Aetna on agreements re-insuring Aetna's risks, and reciting Liberty's contemplated liquidation and the re-insurance of its liabilities by International, International formally assumed all liability of Liberty under those re-insurance agreements, and Aetna *Page 214 
"extended to International such obligations as Aetna has assumed" under such re-insurance agreements.
This constituted no novation — no acceptance by Aetna of International as its debtor in the place and stead of Liberty. The contract expresses no such thing; on the contrary there is an express provision therein to the contrary, to wit, "that this agreement does not in any way change the relation existing between the parties through such agreements" (i.e., the re-insurance agreements between Aetna and Liberty) "other than that caused by the retirement of Liberty from active business." The retirement of Liberty from active business of course effected no change in its liabilities to Aetna or others under contracts already existing. The effect of the tri-party agreement was simply to make Aetna a party to the contract or treaty of re-insurance between International and Liberty, executed September 16th-17th, 1931 — to give to International and Aetna direct rights between themselves instead of indirect rights (and Liberty so stated in its letter of October 9th, 1931) — not to release Liberty. That contract or treaty of re-insurance itself expressly provides that "the liability of the re-insurer, International (to the holders of Liberty's insurance contracts), shall be concurrent with that of Liberty."
Nor is there anything from which any release or waiver by Aetna of Liberty's liability to it can be implied, or raised by estoppel. The fact that Aetna knew that Liberty was intending to liquidate gives no such implication. Liquidation carries no such meaning; and the express contract contravenes any different implied contract. The same thing would be true as to Aetna's knowledge that Liberty intended to dissolve. Dissolution implies an orderly and proper liquidation. There is no proof that Aetna knew that Liberty intended to divest itself of all assets available for the payment of its liabilities — and hence no argument of estoppel in that behalf can be raised. Moreover the proofs show that the tri-party agreement was not in fact executedby Aetna until January 12th, 1932 — after the transfer by Liberty of its assets; hence such transfer could not have been made in *Page 215 
reliance upon the fact of such execution by Aetna or the belief that Aetna had released Liberty. It is further obvious that that transfer could not have been made in reliance upon a belief that Aetna had released Liberty: such a belief would have been utterly insufficient as a basis for that act, because there were many other creditors who had not released.
The evidence of the reports submitted thereafter by Aetna to the banking and insurance commissioner, in which it omitted specification of liability to it by Liberty and specified International as the party liable, might, standing alone and unexplained, have justified a conclusion of release or waiver. Those reports, however, were entirely and satisfactorily explained, and it is perfectly clear from the testimony of the various officers of Aetna and the evidence of the company's records and correspondence (especially in view of the re-insurance treaty and the tri-party agreement before referred to), that no such waiver or release had been made or was intended thereby to be made. There is no proof nor intimation whatever that any of the parties in this proceeding knew of those reports or took any action in reliance upon them, or that any estoppel whatever has arisen against Aetna by reason of them.
International contends that Aetna is estopped as having "kept silent when it was its duty to speak" — that it made no claim against Liberty until International stopped payments and became insolvent. But where was there any duty, or reason why Aetna should make claim against Liberty as long as International was making the payments which it was (as between itself and Liberty) its duty to do? Obviously there was none.
International contends that the release of Liberty is established by the statement that it had been so released, contained in a letter from Hansen, president of International, to the insurance commissioner. The contention is absurd: that letter could in nowise bind the creditors of Liberty, nor Aetna.
International contends that ample provision was made to take care of the Liberty's creditors. Doubtless this was honestly *Page 216 
believed — although the event shows that the provision was not
ample nor sufficient. But no matter how much re-insurance or security was provided for the benefit and protection of Liberty's creditors, providing security is not payment. Those creditors were not thereby paid, and have never yet been paid — and except as to Aetna there is not even any contention that any of them in anywise released Liberty.
International contends the commissioner released the two bonds and mortgages. The testimony of the deputy commissioner shows that such release was refused by the commissioner, who further required that an additional bond be furnished by Liberty. Liberty furnished the additional bond, and by the express terms of its letter to the commissioner of January 7th, 1932, admits that the commissioner intends to continue to hold the statutory deposit.
International contends that Aetna released Liberty, by altering the provisions of the re-insurance contract under which in equity International was the primary debtor to Aetna and Liberty a secondary debtor or surety — because International wrote Aetna on December 29th, 1931, that it would make no contest as to its liability to Aetna for claims which had been submitted by Aetna up to that time. There is no weight to this contention. In the first place it was an act by International, not by Aetna; and it was a voluntary act by International — not a binding agreement on consideration. In the second place it did not alter the terms of the re-insurance contract — it was a mere admission of liability on its part as to claims covered by that contract. In the third place it in nowise harmed or prejudiced Liberty — it did not bind, nor purport to bind, Liberty, or alter any liability or defense by Liberty.
Aetna's claim is valid, as a claim of a general creditor, and the appeal from the receiver's allowance of that claim will be denied (except that the claim is disallowed as a preferred claim — as before stated).
As to the counter-claim filed by General Indemnity Company seeking decree for the cancellation and surrender of a bond of $250,000 executed by General Indemnity and given *Page 217 
to the commissioner as further security for the creditors of Liberty — the ground alleged is that the bond was never completely delivered, and that it was ultra vires the General Indemnity. No proofs were offered by the General at the hearing (except perhaps a stipulation as to New York law), and nothing in the proofs submitted by the other parties establishes the contention of this counter-claim. Neither has any argument or brief been submitted by General. The counter-claim must be dismissed; and doubtless an order that the commissioner turn over this bond to the Liberty receiver should be entered, so that the latter may take such steps as may be necessary or advisable to realize thereon for the benefit of Liberty's creditors.
Whether the receiver, of Liberty should undertake any proceedings against stockholders or directors of Liberty is a matter which possibly may await ascertainment and determination of the total amount of valid claims of creditors of Liberty and of the amount which is recovered from the assets of International; although on the other hand, it may take a long time to liquidate some of the claims against Liberty, and too long delay might be prejudicial. It would seem that Liberty's stockholders and/or directors would have the right of subrogation over against International, for any amounts they might be called upon to pay — since as between them and International the latter is liable under its re-insurance contract for which it received the premium of $306,000 and by which it bound itself to pay all of Liberty's liabilities on its insurance risks.
It should also be added as to the counter-claim filed by Independence against International — no evidence was offered by Independence to support this counter-claim, and it must also be dismissed. *Page 218