BERTHA E. MAURER,

*vs.*

INTERNATIONAL RE-INSURANCE CORPORATION, a corporation organized and existing under the laws of the State of Delaware.

*New Castle, June 28, 1950.*

*William Prickett,* for Lumbermens Mutual Casualty Co., Pacific Indemnity Co. and American Indemnity Co.

*Arthur G. Logan,* of the firm of Logan, Marvel & Boggs, for the receivers.

HARRINGTON, Chancellor: The defendant is an insolvent corporation and the question is whether Lumbermens Mutual Casualty Company, Pacific Indemnity Company and American Indemnity Company, parties to certain contracts binding International Re-Insurance Corporation, are "policyholders" of that corporation.

In 1928, a corporation having the same name as the defendant was organized in California to conduct an insurance business. In May, 1931, the defendant corporation was organized in Delaware, and on June 9th of that year all of the assets of the California corporation were transferred to, and all of its liabilities were assumed by, the Delaware corporation. Before the appointment of the receivers, the defendant had conducted a reinsurance, general casualty insurance, and fidelity and surety business in various states of the Union and in Europe.

Prior to October 31, 1932, it had engaged principally in the reinsurance business, wrote very little direct insurance, and had no authority to write fire or life insurance. In some cases, the reinsurance written was for a proportionate share of the risks, and in others for losses in excess of stipulated amounts. The contracts with Lumbermens Mutual Casualty Company, Pacific Indemnity Company and American Indemnity Company were made with the California corporation, but were among the obligations assumed by the Delaware corporation in June, 1931.

On June 9th of that year, International deposited with the Delaware Insurance Commissioner United States Treasury Bonds of the face amount of $250,000, purportedly pursuant to *Chapter* 20, *Paragraph* 643, *of the Revised Code of* 1915. At the hearing no trust agreement was produced, but some certificates issued by the Delaware Insurance Commissioner stated that the deposit was "for the security and benefit of each and all of its policyholders and holders of its reinsurance contracts, agreements and treaties of every kind and nature * * *." Other certificates were less specific.

On June 27, 1932, International withdrew the United States Treasury Bonds and deposited three California real estate mortgages with the Delaware Insurance Commissioner. They were transferred to that officer by three separate assignments, each of which stated that the deposit was "in trust, however, for the common benefit and security of all of its policyholders and in accordance with the objects, uses, intents and purposes of the aforesaid Section 72 of Chapter 20 of the Revised Code of 1915 of the Laws of Delaware; and for no other object, use, intent or purpose whatsoever."

The statutory provision referred to in the assignments, *Par.* 643, § 72, *Chapt.* 20, *Revised Code* 1915, had been repealed prior thereto, and the Act then in force, *Vol.* 37, *Laws of Delaware, Chapter* 52, *Section* 14, authorized de-

posits with the Insurance Commissioner "upon such trusts as shall be designated by the company and approved by the Commissioner." Both statutes were enacted in conformity with the laws of certain other states and in order to permit the Delaware corporation to do business in those states.

Notwithstanding the incorrect reference to the statute in the assignments, the language created a trust by private contract for the benefit of International's "policyholders". *Maurer v. International Re-Insurance Corp.*, 20 *Del. Ch.* 173, 174 *A*. 360. This is true, though some certificates merely stated that the mortgages had been deposited by International with the Insurance Commissioner without stating the terms of the deposit. By order of this court, pursuant to statute (*Art.* 8, *Chapt.* 20, *Revised Code of Delaware*, 1935, § 538, et seq.), the mortgages so deposited were transferred by the Insurance Commissioner to the receivers. The mortgages were liquidated and, after the deduction of certain expenses, the receivers have in hand $512,797.64, which is the fund in which the claimants seek to participate.

The respective claims filed by Pacific Indemnity Company for $938,791.66, Lumbermens Mutual Casualty Company for $160,228.51, and American Indemnity Company for $50,243.57 were allowed against the insolvent corporation in ancillary receivership proceedings and were certified to the primary receivers for payment.

The right of the claimants to participate in the general fund in the hands of the receivers is not involved in this proceeding.

The claim of Pacific Indemnity Company was based on a so-called "Treaty of Re-insurance" and covered primary workmen's compensation and similar "policies" written by the company insuring for a period of one year, or less, the liability of employers for injuries to or death of employees

"and becoming effective while this Agreement is in force." Pacific was to retain a certain percentage of the risks assumed by it under such policies but agreed "to cede to the Reinsurer, and the Reinsurer" agreed (1) "to accept by way of reinsurance" a certain percentage of Pacific Indemnity Company's "Gross net writings" on a "Quota Share basis", and (2) to pay certain specified amounts "on an Excess basis" when the ultimate net loss in any one accident exceeded specified sums. The instrument also provided:

(1) That the "liability of the Reinsurer shall commence simultaneously with that of the Company and shall be subject * * * to all the general and special stipulations * * * of the original policy * * *"; (2) that the Company "shall settle all claims in which this reinsurance may be interested, and the same shall be binding upon the Reinsurer * * *"; and (3) when so requested by the reinsurer, the Company "will afford the Reinsurer an opportunity to be associated with the Company in the defense or settlement of any claim, suit or proceeding involving this reinsurance."

All cessions on the quota share basis were to be set forth in a monthly statement issued by Pacific showing premiums "on all reinsurance effected hereunder," and analyzed as to line, etc. As respect cessions made on an excess basis, monthly statements were also to be issued by Pacific to the reinsurer giving the total amount of the premiums earned during the preceding month and the amount of premium due from Pacific to International. International was to be notified of any claims involving it as the "Reinsurer". The "Agreement" could be terminated as to future business on certain notice. The contract became effective September 1, 1928, and was to continue in effect until terminated as therein provided. By endorsements, it also covered policies issued by Pacific Indemnity Company on or after January 1, 1928, and on and after January 1, 1929. In the assignment of the instrument, the defendant bound itself as "Reinsurer".

The contract of American Indemnity Company (and/or

American Fire and Marine Insurance Company) as their interests might appear, with the California company, designated the "Reinsurer", was likewise called a "Treaty of Reinsurance". By that instrument, the reinsurer agreed to repay its share of any ultimate net losses which the company might pay by reason of the liability assumed under its automobile, motorcycle, elevator, garage, teams and general public liability policies "issued while this contract is in force," and covering risks in excess of certain stipulated amounts on account of one or more persons injured or killed in an accident. The liability of the "Reinsurer" was to commence simultaneously and automatically with that of the company on all policies issued during the existence of the treaty. Notice was to be given of any accident in which this "reinsurance is * * * involved." The defendant company was repeatedly referred to as the "Reinsurer". In event of cancellation, this "treaty" shall remain in force and effect on all policies "reinsured" prior to the effective date of cancellation. The instrument provided that the originating companies would report to International, within twenty-five days after the close of each month, on bordereau forms all insurances effected for excess limits during the month. International, however, reserved "the right to reject or cancel any risks or class of risks ceded" under the treaty. The so-called treaty was to take effect August 1, 1929.

The contract of Lumbermens Mutual Casualty Company (together with Federal Mutual Liability Insurance Company and/or American Motorist Insurance Company, as their interests might appear), assumed by the Delaware corporation, was also called a "Treaty of Reinsurance", but the California company, with which the contract was originally made, was called the "Reinsurer". The agreement related to "reinsurance of loss under Workmen's Compensation and/or Employers' Liability policies issued by the Companies." By its terms, the "Reinsurer" agreed to pay to the companies the portion of any loss in excess of a

specified amount "sustained under policies issued by the Companies and which is the result of any single accident or series of accidents arising out of one and the same occurrence and which happen during the currency of this contract." With certain exceptions, the contract also applied "to all policies or contracts in force on the effective date hereof and commencing or renewed on or after the effective date hereof; provided, however, that in the event any of the Companies shall have other excess reinsurance continuing in force on and after the effective date of this contract, this reinsurance shall not be applicable to such policies or contracts as are covered by such other excess reinsurance." The instrument provided for monthly notices to the so-called "Reinsurer" of all premiums on policies "covered hereunder during the previous month" and of any accident in which "Reinsurance" was involved. A subrogation clause also described the original assignor as the "Reinsurer". A clause in the instrument stated that the word "policy" as used therein, referred to the original insurance.

The exceptants claim that the word "policy" is a general term applicable to all kinds of insurance contracts, and that the agreements relied on are what are termed "open reinsurance policies." The receivers, on the other hand, claim that in the United States, at least, reinsurance contracts are never known as policies, and that in any event the contracts relied on are nothing more than treaties or agreements for reinsurance.

Insurance is a contract whereby, for a stipulated consideration called a premium, one party undertakes to indemnify another against loss by a certain specified contingency or peril called a risk. *Webster's International Dictionary, "Insurance"; 1 Couch Cyc. Ins. Law* 3; see also *Dover Glass Works Co. v. Amer. Fire Ins. Co.,* 1 *Marv.* 32, 29 *A.* 1039, 65 *Am. St. Rep.* 264. Essentially, reinsurance is a contract to indemnify one who has insured a risk. *Friend*

*Bros. Inc. v. Seaboard Surety Co.*, 316 *Mass.* 639, 56 *N.E.* 2d 6, 153 *A.L.R.* 962; *People ex rel. Sea Ins. Co. v. Graves*, 274 *N.Y.* 312, 8 *N.E.* 2d 872; *Pioneer Life Ins. Co. v. Alliance Ins. Co.*, 374 *Ill.* 576, 30 *N.E.* 2d 66; 13 *Appleman on Insurance Law and Practice, pages* 433, 435; 46 *C.J.S., Insurance*, § 1220, *pages* 195, 196; see also *Greenman v. General Reinsurance Corp.*, 237 *App. Div.* 648, 262 *N.Y.S.* 569. Some of the expert witnesses gave a similar definition of the term "reinsurance". But the authorities indicate that it is also applied to the ceding by one insurance company to another of all or a portion of its risks for a stipulated part of the premium and an agreement to indemnify it in case of loss. *Webster's International Dictionary, "Reinsurance"*; 13 *Appleman on Ins. Law and Practice, page* 433.

Insurance originated in the custom of the merchants in ancient times and probably first dealt with marine insurance. 1 *Couch Cyc. Ins. Law* 2; *Richards on Insurance* 12. Usually contracts of insurance, as well as reinsurance, are contracts of indemnity, *Dover Glass Works Co. v. American Fire Ins. Co., supra;* 46 *C.J.S., Insurance*, § 1220, *page* 196, and were valid at common law. *Phoenix Ins. Co. v. Erie & W. Trans. Corp.*, 117 *U.S.* 312, 6 *S.Ct.* 750, 29 *L.Ed.* 873. In practice, the written instrument expressing the contract of the insurer is called a "policy." *Century Dictionary, "Insurance"; Webster's Inter. Dict., "Policy"*; 18 *Halsbury Laws of England* 424. Likewise, a contract of indemnity made by one insurer with another to protect the first from a risk it has already assumed is termed a "reinsurance policy." *Pioneer Life Ins. Co. v. Alliance Ins. Co., supra; People ex rel. Sea Ins. Co. v. Graves, supra; Hastie v. DePeyster*, 3 *Caines, N.Y.*, 190, 191; *Boston Ins. Co. v. Globe Fire Ins. Co.*, 174 *Mass.* 229, 54 *N.E.* 543, 75 *Am.St.Rep.* 303; see also *Forsikringsaktiesebskabet v. Attorney General, L.R.* (1925) *App. Cas.* 639. While the evidence of experts with respect to the application of the term "policy" to contracts of reinsurance, is conflicting, many of the claimants' exhibits are examples of its use.

There are cases which conclude that the holders of re-insurance contracts made by a corporation, which subsequently becomes insolvent, are not policyholders of that corporation and cannot participate in the distribution of a fund deposited for the benefit of its policyholders (*Aetna Casualty & Surety Co. v. International Re-Insurance Corp.*, 117 *N.J. Eq.* 190, 191, 175 *A.* 114; *In re New Jersey Fidelity & Plate Glass Ins. Co.*, 191 *A.* 475, 15 *N.J.Misc.* 384; *Shepherd v. Virginia State Ins. Co.*, 120 *Va.* 383, 91 *S.E.* 140; *Cunningham v. Republic Ins. Co.*, 127 *Tex.* 499, 94 *S.W.*2d 140; *People by Van Schaick v. General Indemnity Corp. of America*, 274 *N.Y.* 510, 10 *N.E.* 2d 523), but they are based on the construction of statutory provisions and do not govern this case. While reinsurance was known at common law and is in constant use in this country, the cases last cited hold that it is reasonable to infer that the statutes before the courts were only intended for the protection of the general public, holding primary insurance policies or claiming under other contracts expressly referred to in the statutes. They, therefore, conclude that the words "policy" and "policyholders," as used therein, do not include contracts of reinsurance between two insurance companies, and seem to regard them as participation agreements. See, however, *Forsikringsaktiesebskabet v. Atty. General, supra.* But we are considering the distribution of a trust fund created by a special agreement.

Another question is whether the claimants' contracts can be classed as reinsurance policies, or whether they are mere treaties for reinsurance. The claimants say that their exceptions to the receivers' recommendations with respect to the classification of their claims do not raise that question, but I do not agree with that contention.

While insurance policies are in substance contracts of insurance (*Pioneer Life Ins. Co. v. Alliance Ins. Co. supra; Forsikringsaktiesebskabet v. Attornel General, supra*), they often provide that the risks assumed by the insurer will au-

tomatically include other designated classes of property that may be acquired from time to time by the insured. *Richards on Ins.*, § 18; *Couch Cyc. Ins. Law* 90. Such instruments are called "open policies." *Cent. Dict.*, *"Open Policy"*; see also 1 *Couch, supra,* § 71. Contracts of reinsurance may also contain somewhat the same provisions. *Boston Ins. Co. v. Globe Fire Ins. Co., supra;* 46 *C.J.S., Insurance,* § 1224, *page* 202; see also *Sun Ins. Office of London v. Merz,* 63 *N.J.L.* 365, 43 *A.* 693, reversed on other grounds, 64 *N.J.L.* 301, 45 *A.* 785, 52 *L.R.A.* 330; 33 *C.J.* 48. 46 *C.J.S., Insurance,* § 1224. Reinsurance business, as in the contracts before the court, is often conducted, however, under general contracts usually termed "treaties," signed by both parties and containing provisions relating to the different situations described in them, under which reinsurance will be effective. *Richards on Ins.,* 449; *Pioneer Life Ins. Co. v. Alliance Ins. Co., supra;* 13 *Appleman on Insurance Law and Practice, page* 435; see also *Friend Bros. Inc. v. Seaboard Surety Co., supra.* The contract before the court in *Aetna Casualty & Surety Company v. International Re-Insurance Corporation, supra,* was of that nature and only applied to the reinsurance of future risks when incurred by the primary insurer. In that case and in other similar cases, the courts were evidently reluctant to class the contracts as reinsurance policies.

Contracts for reinsurance and contracts of reinsurance are not synonymous, (*Pioneer Life Ins. Co. v. Alliance Ins. Co., supra;* 13 *Appleman on Insurance Law and Practice, page* 435; see also *Northwestern Mutual Fire Ins. Ass'n. v. Union Mutual Fire Ins. Co.,* (9 *Cir.*) 144 *F. 2d* 274), but the proper classification of such instruments is a matter of interpretation not always free from difficulty. Any document containing the terms of a contract of reinsurance may in effect be regarded as a "policy." See *Forsikringsaktieseb-skabet v. Atty. Gen., supra.*

Applying these principles, the contracts of American Indemnity Company, Pacific Indemnity Company and Lum-

bermens Mutual Casualty Company are not reinsurance policies and those companies are not entitled to participate in the distribution of the special trust funds in the hands of the receivers for the benefit of the policyholders of the insolvent corporation.

The American Indemnity Company contract required it to report to the defendant on bordereau forms the primary risks that might be assumed by it while the contract was in force, but International Re-Insurance Corporation had the right to reject all cessions offered by way of reinsurance. Moreover, the contract related only to insurance risks that might thereafter be assumed by the company. That is not a contract of reinsurance and cannot be regarded as a policy.

The Pacific Indemnity Company contract, though the liability of the so-called reinsurer was to commence simultaneously and automatically with that of the company, only provided for the cession and unconditional acceptance by way of reinsurance of portions of the risks on such primary policies of certain kinds as might be written during the existence of the contract. It was couched in general terms and covered no outstanding risks of the primary insurer at the time of its execution, and notices of such risks as might be assumed were only to be given by the so-called reinsurer monthly. This is not in substance a contract of reinsurance and is not a policy. Cf. *Pioneer Life Ins. Co. v. Alliance Ins. Co., supra; Sofia Bros. v. General Reinsurance Corp.*, 153 *Misc.* 6, 274 *N.Y.S.* 565; *Forsikringsaktiesebskabet v. Attorney General, supra.*

The Lumbermens Mutual Casualty Company contract required it to cede and the defendant company was bound to accept by way of reinsurance portions of the risks under certain primary insurance policies, issued both before and after the contract took effect. The company was not obligated to list its outstanding risks when the contract was executed or to give notice of any risks thereafter assumed by it. It was merely required to notify the defendant monthly of the

amount of the premiums on all policies "covered" by the contract "during the previous month." The instrument is not only termed a "treaty" but it contains an express provision that the word "policy" as used therein refers to the primary contracts of insurance. When all of its general provisions are considered, it is reasonable to conclude that it was intended to be a mere treaty for reinsurance, and not a policy. *Cf. In re National Benefit Assurance Co., L.R.* (1928) 1 *Ch. Div.* 74.

There is a dictum in *People ex rel. Sea Ins. Co. v. Graves, supra,* that a contract by which two or more insurers agree to reinsure partially lines thereafter taken by one insurer, may be termed an "open policy," but that statement is not supported by *Continental Ins. Company v. Aetna Ins. Co.,* 138 *N.Y.* 16, 33 *N.E.* 724, which is the only case cited by the court.

All of the exceptions to the recommendations made by the receivers are therefore overruled, and an order will be entered accordingly.

Note. Reversed on appeal. *Sec.* 96 *A.* 2d 360.